INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS, BLACKSMITHS, FORGERS & HELPERS—LOCAL 1603, Plaintiff–Appellee,

v.

TRANSUE & WILLIAMS CORP., and Industrial General Corp., Defendants–Appellants.

No. 88–3485.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 14, 1989.

Decided July 21, 1989.

Rehearing and Rehearing En Banc Denied Aug. 24, 1989.

James S. Gwin (argued), Gutierrez, Mackey & Gwin, Canton, Ohio, for plaintiff-appellee.

Timothy D. Wood (argued), Schwartz, Einhart, Wood & Szuter, Cleveland, Ohio, for defendants-appellants.

Before KEITH, MARTIN and RYAN, Circuit Judges.

KEITH, Circuit Judge:

Defendants, Industrial General Corporation ("Industrial"), and Transue & Williams Corporation ("Transue"), appeal from the judgment of the district court ordering them to proceed with arbitration of retiree insurance and severance pay grievances filed by plaintiff, the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, Local 1603 (the "Union"). For the reasons set forth below, we AFFIRM.

### I.

### A.

The Union is the exclusive bargaining representative for certain employees at the Alliance Forging Plant ("Alliance"), which is owned by Transue and located in Alliance, Ohio. On March 1, 1984, the Union and Transue entered into a collective bargaining agreement (the "1984 Agreement"). The 1984 Agreement contained grievance procedures that concluded in binding arbitration. In January and February 1986, the Union and Transue conducted thirteen negotiating sessions to amend the 1984 Agreement. Changes were made in the grievance and arbitration provisions of the 1984 Agreement, as well as the work hours, job assignments and rates of pay for designated workers. On February 28, 1986, the parties believed that they had reached a consensus on the terms of a new collective bargaining agreement. This amended agreement was ratified by the local Union membership on March 9, 1986.

In the months that followed, both the Union and Transue complied with all of the terms of the parties' 1984 agreement, as amended by the 1986 negotiations (the "1986 Contract").

After April 18, 1986, the Union asked Transue to prepare the 1986 Contract for formal execution as the new collective bargaining agreement. At a June 13, 1986 meeting, however, the parties discovered a remaining dispute over contract terms. The Union believed that the January and February 1986, negotiations had resulted in the addition of the terms "successors and assigns" to the preamble of the 1986 Contract. Transue disputed the inclusion of the "successors and assigns" provision, but did not disagree with the terms nor effect of the grievance provision.

On June 18, 1986, the Union local membership voted to reject Transue's version of the 1986 Contract because the "successors and assigns" terms had been deleted. On June 25, 1986, Transue sent a letter to the Union asserting that no new collective bargaining agreement had been reached because the parties never agreed on the successors and assigns issue. Significantly, the letter did not state that Transue was attempting to revoke the parties' agreement as to the grievance procedures, including the right to proceed to binding arbitration.

As a result of this impasse, the Union filed charges with the National Labor Relations Board ("NLRB") alleging that Transue had violated Sections 8(a)(1) and (5) of the National Labor Relations Act ("NLRA"), by failing to execute a collective bargaining agreement that reflected the terms and conditions of the negotiations. See 29 U.S.C. § 158(a)(1), (5). On September 12, 1986, the NLRB Regional Director found that the parties had failed to agree on the "successors and assigns" provision. Thus, Transue's refusal to execute a new collective bargaining agreement was excused. The General Counsel subsequently denied the Union's appeal.

During the 1986 calendar year, both the Union and Transue worked peacefully together without a formal collective bargaining agreement. The Union members did not strike, but continued to adhere to the 1986 Contract. Similarly, Transue honored the 1986 Contract by paying the new wage rates and vacation pay amounts. Transue also continued to follow the grievance procedures negotiated pursuant to the 1986 Contract. During this period, Transue accepted, processed and paid several grievances without ever disputing the grievance procedure established by the 1986 Contract.

By a letter dated November 13, 1986, Transue notified the Union that it would terminate operations at Alliance no later than December 31, 1986.[1] On December 9, 1986, the parties began negotiations over the terms of the plant shutdown. At the initial meeting, the Union presented three grievances involving Transue's refusal: first, to release accrued vacation pay (Grievance No. 10,000); second, to pay vested, status life insurance benefits, (Grievance No. 80,000); and third, to pay severance benefits owing under the 1986 Contract (Grievance No. 90,000). Transue rejected these Union complaints and argued that because a new collective bargaining agreement was never executed, it would not recognize any grievance or arbitration obligations. After Transue refused to submit the disputed grievances to arbitration, the Union initiated this action.

#### B.

On January 12, 1987, the Union filed a complaint against Transue asserting jurisdiction under Section 301 of the Labor Management Relations Act ("LMRA"). 29 U.S.C. § 185. Five causes of action were alleged. First, the Union argued that Transue had breached its contractual obligation to release accrued vacation pay obligations. Second, the Union alleged that, in violation of the agreement of the parties, Transue has failed and refused to release severance pay entitlements. Third, the Union complained that Transue had failed to pay certain pension obligations. Fourth,

---

1. Transue sold Alliance to T & W Forge, Inc., a separate non-party company.

the Union argued that Transue had breached its contractual obligation to honor the established grievance procedure by refusing to submit Grievances No. 10,000, No. 80,000 and No. 90,000 to binding arbitration. Fifth, the Union sought damages from Industrial, the parent corporation of Transue.

Transue filed an answer to the complaint on January 28, 1987, and filed a motion for summary judgment on February 13, 1987. To support its motion, Transue argued that the Union's complaint raised issues within the exclusive jurisdiction of the NLRB. Thus, according to Transue, the district court's jurisdiction was preempted. In addition, Transue argued that, because there was no existing labor contract between the parties, the district court had no jurisdiction under Section 301 of the LMRA.

On March 19, 1987, the Union moved for partial summary judgment, arguing that Transue was clearly obligated to proceed to arbitration on the three disputed grievances. After considering the parties' briefs and oral argument on both motions, the district court issued an opinion and judgment on February 22, 1988. First, the district court rejected Transue's argument that the action had been preempted by the NLRB and found that "the conduct at issue allegedly constitutes both a breach of contract and an unfair labor practice. In such a case the federal [d]istrict [c]ourt enjoys concurrent jurisdiction with the NLRB." *International Bhd. of Boilermakers, Local 1603 v. Transue & Williams Corp.*, No. C87–74A, slip op. at 14 (N.D.Ohio Feb. 22, 1988). Second, the district court dismissed Transue's argument that there was no labor contract sufficient to vest the court with jurisdiction under Section 301. The district court initially noted that a collective bargaining agreement is not necessary to confer Section 301 jurisdiction upon a federal court. The district court then found that both the Union and Transue had previously evidenced an intent to be bound to the grievance and arbitration provisions of the 1986 Contract. Relying substantially

on *Retail Clerks Int'l Ass'n, Local Unions Nos. 128 and 633 v. Lion Dry Goods*, 369 U.S. 17, 82 S.Ct. 541, 7 L.Ed.2d 503 (1962), the district court held that the parties maintained an agreement " 'significant to the maintenance of labor peace between them,' " which supported the invocation of Section 301 jurisdiction by the court. *International Bhd. of Boilermakers*, No. C87–74A, slip op. at 17 (quoting *Retail Clerks*, 369 U.S. at 28, 82 S.Ct. at 548). After finding that a contract existed between the parties, the district court concluded that national labor policy reserved the resolution of disputed contract terms to the arbitrator. Thus, the district court granted the Union's motion for partial summary judgment and ordered Transue to proceed with arbitration of Grievances No. 80,000 (for retiree insurance benefits), and No. 90,000 (for severance pay).[2]

Transue filed a motion to amend the district court's judgment on March 2, 1988. After the district court denied the motion on May 12, 1988, Transue filed a notice of appeal to this court on May 24, 1988.

## II.

In *Bobbie Brooks, Inc. v. International Ladies Garment Workers Union*, 835 F.2d 1164 (6th Cir.1984), we addressed the standard of review to be applied to a district court decision finding that a labor contract existed sufficient to invoke Section 301 jurisdiction:

> We begin our analysis by noting that a trial court's finding that a valid contract exists will not be set aside unless it is clearly erroneous. This factual determination will be deemed clearly erroneous only where it is against the clear weight of the evidence or when, upon review of the evidence, the appellate court "is left with the definite and firm conviction that a mistake has been committed."

*Id.* at 1168 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395,

---

**2.** Because Grievance No. 10,000 (for vacation pay) was moot, the district court did not order

Transue to submit that grievance to arbitration.

68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)) (citations omitted).

## A.

Transue argues that because the parties did not execute a new collective bargaining agreement after the 1984 Agreement expired, the district court erred in finding that the 1986 Contract fell within the parameters of Section 301. We disagree with the argument advanced by Transue and find that the district court did not err in holding that the 1986 negotiations between Transue and the Union resulted in a labor contract sufficient to invoke Section 301 jurisdiction.

The principles controlling a determination of whether a Section 301 contract exists are well established. In *Retail Clerks,* the Supreme Court broadly construed the terms of Section 301, defining "contract" to include any "agreement between employers and labor organizations significant to the maintenance of labor peace between them." 369 U.S. at 28, 82 S.Ct. at 548. Reversing both lower courts in *Retail Clerks,* the Supreme Court held that in an action to compel arbitration, Section 301 jurisdiction does not require a collective bargaining agreement between the parties. *Id.* The Court also suggested that Section 301 jurisdiction does not require the parties to enjoy a meeting of the minds on all issues of a completed labor contract. *See id.* at 27, 82 S.Ct. at 547 (holding that a pre-hire contract could be enforced under Section 301 even though, "[s]uch a contract might cover only hiring procedures and not wages, hours, and conditions of employment").

In *District 2, Marine Eng'rs Beneficial Assn. v. Amoco Oil Co.,* 554 F.2d 774 (6th Cir.1977), we applied the central holding of *Retail Clerks* to find Section 301 jurisdiction where the parties had not executed a formal collective bargaining agreement. We held that a "union representing a bargaining unit comprised exclusively of supervisors ... is a labor organization representing employees entitled to invoke federal jurisdiction under [S]ection 301(a)." *Marine Eng'rs,* 554 F.2d at 779 (citations omitted). Although defendant Amoco Oil ar-

gued that formal recognition of a bargaining representative is a prerequisite to Section 301 jurisdiction and that such recognition must be made manifest in a collective bargaining agreement, we concluded that recognition of "a union of supervisors, for the limited purpose of invoking [S]ection 301(a) jurisdiction, is evidenced by the existence of any contract cognizable under the *Retail Clerks* standard." *Marine Eng'rs,* 554 F.2d at 778.

▮▮▮ A labor contract may fall within the parameters of Section 301 even if the employer and the union have not resolved disputes over substantive terms, including wage rates and work place conditions. *See Heheman v. E. W. Scripps Co.,* 661 F.2d 1115, 1121 (6th Cir.1981), *cert. denied,* 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982). Because federal labor policy has emphasized the important goal of maintaining industrial peace, the technical rules of commercial contract law need not be strictly applied to labor contracts. *See NLRB v. Truck drivers, Chauffeurs and Helpers, Local Union No. 100,* 532 F.2d 569, 571 (6th Cir.), *cert. denied,* 429 U.S. 859, 97 S.Ct. 160, 50 L.Ed.2d 137 (1976). Thus, the existence of a labor contract "does not depend on its reduction in writing; it can be shown by *conduct* manifesting an intention to abide by agreed-upon terms." *Bobbie Brooks,* 835 F.2d at 1168 (citations omitted and emphasis added).

Where the parties failed to execute a formal collective bargaining agreement, other circuit courts have upheld Section 301 jurisdiction. *See, e.g., Smith v. Kerrville Bus Co., Inc.,* 709 F.2d 914, 920 (5th Cir. 1983) (holding that Section 301 "must be broadly construed to encompass any agreement, written or unwritten, formal or informal, which functions to preserve harmonious relations between labor and management"); *General Teamsters, Local 162 v. Mitchell Bros. Truck Lines,* 682 F.2d 763, 765–66 (9th Cir.1982) (upholding district court's Section 301 jurisdiction to enforce strike settlement agreement where there was no collective bargaining agreement).

In *Washington Heights Mental Health Council, Inc., v. District 1199, National*

*Union of Hosp. and Health Care Employees,* 748 F.2d 105 (2nd Cir.1984), the Second Circuit held, in a case similar to the one at bar, that the district court had Section 301 jurisdiction to determine whether the employer and the union had agreed to arbitrate disputes, even though the purported agreement had not been reduced to writing. *See id.* at 108–09. The *Washington Heights* parties believed that they had negotiated a new collective bargaining agreement, but subsequently found that disputed terms remained. Later, the NLRB dismissed the union's unfair labor practice charge which asserted that the employer breached its statutory duty to bargain by failing to reduce the agreement to writing. *See id.* at 106. Both the union and the employer abided by the terms of the purported collective bargaining agreement, including its grievance and arbitration provisions, and both "benefited substantially from the mutual assumption that there *was* an agreement." *Id.* at 108. When the employer brought a Section 301 action to vacate an arbitration award for the union, the district court granted summary judgment for the employer and vacated the arbitrator's decision. The Second Circuit then reversed and remanded the case for determination of the central issue: whether the parties had, in fact, agreed to submit disputes to arbitration in the relevant time period. If the parties had reached such an agreement, the Second Circuit concluded, then the arbitrator's award to the union should have been upheld. *See id.* at 107–09.

In the case at bar, the district court correctly found that Transue and the Union agreed to adhere to the grievance and binding arbitration provisions of the 1986 Contract. Transue accepted, processed, and responded to over fifteen grievances pursuant to the procedures established by the 1986 Contract. During this period of operations without a formal collective bargaining agreement, the Union did not strike, picket or resort to the use of any economic weapons, but continued to work for the new pay rates negotiated in the 1986 Contract. Thus, both the Union and Transue evidenced, by their *conduct,* an intent to remain bound to the grievance and arbitration provisions of the 1986 Contract. *See Bobbie Brooks,* 835 F.2d at 1168. Moreover, both parties, especially Transue, benefitted from the resultant "industrial peace" and the common belief that there was an agreed upon dispute resolution procedure. *See Retail Clerks,* 369 U.S. at 28, 82 S.Ct. at 548; *Washington Heights,* 748 F.2d at 108.

After reviewing and crediting the evidence presented by the Union, the district court correctly concluded that the parties' 1986 Contract was sufficient to invoke Section 301 jurisdiction. Even though the parties had not agreed upon all substantive terms, there was no evidence to indicate a dispute over the terms of the grievance and arbitration provisions. In fact, the only significant contract dispute related to the "successors and assigns" clause; this one dispute could not obviate the entire 1986 Contract. *See Retail Clerks,* 369 U.S. at 27, 82 S.Ct. at 547; *Heheman,* 661 F.2d at 1121.

Thus, we are persuaded that because Transue and the Union evidenced acceptance of the grievance and arbitration provisions of the 1986 Contract through their conduct, the absence of a complete collective bargaining agreement does not preclude finding a *Retail Clerks* contract.

**B.**

Transue next argues that the grievances which the district court ordered to be arbitrated are not arbitrable due to the expiration of the 1984 Agreement. The district court concluded that the parties "at least had an agreement to abide by the grievance procedure as negotiated in the early part of 1986 and which culminated in binding arbitration.... [It is not, however,] the function of the [c]ourt to interpret the meaning of any of the other terms of the agreement or to pass upon the merits of the grievances." *International Bhd. of Boilermakers,* No. C87–74A at 19. We disagree with the argument advanced by Transue and find that the district court did

not err in compelling arbitration of Grievances No. 80,000 and No. 90,000.

In *United Steelworkers of America v. Warrior & Gulf Navigation, Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), the Supreme Court held that while arbitration is a matter of contract, whether the parties have intentionally bound themselves to arbitrate a particular grievance is a question for judicial determination. Federal courts are to look to the terms of the agreement to determine whether "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 582–83, 80 S.Ct. at 1352–53; *See also AT & T Technologies, Inc. v. Communication Workers,* 475 U.S. 643, 649–50, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648 (1986). Thus, "given the existence of an arbitration clause, a presumption of arbitrability arises, with all doubts resolved in favor of coverage." *Local 670, United Rubber Workers v. International Union, United Rubber Workers,* 822 F.2d 613, 617 (6th Cir.1987), *cert. denied,* ── U.S. ──, 108 S.Ct. 731, 98 L.Ed.2d 679 (1988). The presumption of arbitrability is generally applicable to any dispute between the employer and the union where the party bringing the grievance enjoys recourse to economic weapons. *Communication Workers v. Michigan Bell Telephone Co.,* 820 F.2d 189, 192–93 (6th Cir.1987). Even when a grievance arises after the expiration of the formal collective bargaining agreement, the presumption of arbitrability "must be negated expressly or by clear implication." *Nolde Brothers, Inc. v. Local No. 358, Bakery Workers,* 430 U.S. 243, 255, 97 S.Ct. 1067, 1074, 51 L.Ed.2d 300 (1977).

During their 1986 negotiations, Transue and the Union agreed to an arbitration proposal that defined grievance as a "a difference or dispute, . . . as to the interpretation, application or claimed violation of *any* term or provision of this agreement." Brief of the Defendant at 26 (emphasis added). There is no evidence to suggest that the parties were not conscious of federal labor policy and the presumption of arbitrability when they agreed to resolve their contractual differences through arbitration. Nor is there reason to believe that the expiration of the 1984 Agreement impacted considerations behind their initial decision to agree to an arbitration clause— the arbitrator's prompt approach, special competence and comparative low cost. *See Nolde Brothers,* 430 U.S. at 254–55, 97 S.Ct. at 1073–74.

In addition, the parties' 1986 Contract lacked any express provisions excluding the now disputed grievances from submission to an arbitrator. *See Warrior & Gulf,* 363 U.S. at 582–83, 80 S.Ct. at 1352–53; *Emery Air Freight Corp. v. Local Union 295,* 786 F.2d 93, 98 (2nd Cir.1986). Moreover, the arbitration provision did not expressly exclude from its operation disputes that arose under the 1986 Contract, but were based on subsequent events. *See Nolde Brothers,* 430 U.S. at 253, 97 S.Ct. at 1073.

The district court found that the parties established a labor contract significant to the maintenance of industrial peace. At all relevant times, the parties refused to marshal economic weapons and adhered to the grievance and arbitration provisions of their contract. *See Communications Workers,* 820 F.2d at 192–93. Because the parties knowingly and broadly defined the scope of the issues to be arbitrated and did not designate exclusions, we agree with the conclusions of the district court that Grievances No. 80,000 (for payment of vested, status life insurance benefits), and No. 90,-000 (for payment of severance benefits) remain subject to the arbitration provisions of the 1986 Contract. *Cf. Nolde Brothers,* 430 U.S. at 255, 97 S.Ct. at 1074 ("[T]he parties failure to exclude from arbitrability contract disputes arising after termination, far from manifesting an intent to have arbitration obligations cease with the agreement, affords a basis for concluding that they intended to arbitrate all grievances arising out of the contractual relationship.").

In sum, we are persuaded that the arbitrator, not the district court, should determine the merits of Grievances No. 80,000 and No. 90,000.

## C.

■ Transue next argues that because the parties' 1984 Agreement expired unrenewed and because the present controversy centers on its alleged failure to bargain in good faith, the district court erred by not finding its jurisdiction preempted by the NLRB. The Union responds that the NLRB and the district court both enjoyed jurisdiction because the present case involves Transue's perpetration of an unfair labor practice *and* Transue's breach of the 1986 Contract. We are persuaded by the arguments advanced by the Union. Relying substantially on our prior conclusions, discussed above, that the parties entered into a labor contract and that Transue breached that contract by refusing to arbitrate the disputed grievances, we find that, under Section 301, the district court enjoyed concurrent jurisdiction with the NLRB.

In *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962), the Supreme Court held that where the challenged conduct involves breach of contract, the Section 301 jurisdiction of the district court is not preempted by the NLRB:

> Since this was a suit for violation of a collective bargaining contract within the purview of Section 301(a) ..., the preemptive doctrine of cases such as *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 [79 S.Ct. 773, 3 L.Ed. 2d 775] [(1959)] based upon the exclusive jurisdiction of the [NLRB], is not relevant.

*Id.* at 101 n. 9, 82 S.Ct. at 575 n. 9. *See also Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Employees v. Lockridge*, 403 U.S. 274, 298, 91 S.Ct. 1909, 1923, 29 L.Ed.2d 473 (1971); *Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 268, 84 S.Ct. 401, 407, 11 L.Ed.2d 320 (1964).

In *Serrano v. Jones & Laughlin Steel Co.*, 790 F.2d 1279, 1288 (6th Cir.1986), *motion denied*, —— U.S. ——, 109 S.Ct. 549, 102 L.Ed.2d 577 (1988), *reconsideration denied*, —— U.S. ——, 109 S.Ct. 775, 102 L.Ed.2d 768 (1989), we applied the rule of *Motor Coach Employees*. Our *Serrano* decision affirmed the judgment of a district court that properly *did not apply* the *Garmon* preemption tests to an action brought by an employee alleging breach of contract. We concluded that federal courts "have jurisdiction under [S]ection 301 of the Labor Act over suits to enforce collective bargaining agreements. This is true *even when* the employer's conduct is arguably covered by [S]ection 7 or 8." *Serrano*, 790 F.2d at 1288 (emphasis added). *See also Storey v. Local 327, International Bhd. of Teamsters*, 759 F.2d 517, 522 (6th Cir.1985).

The foregoing considerations leave us unpersuaded by Transue's arguments. First, we acknowledge that the Union may receive a remedy from the NLRB in response to its unfair labor practice charge. The possibility that Transue's conduct constituted an unfair labor practice, however, will not preclude the Union from pursuing an action to remedy Transue's breach of the 1986 Contract. *See Carey*, 375 U.S. at 268, 84 S.Ct. at 407. Second, we find no support for Transue's argument that the absence of a formal collective bargaining agreement between the parties should prevent the Union from bringing this breach of contract action. *See Retail Clerks*, 369 U.S. at 28, 82 S.Ct. at 548; *Washington Heights*, 748 F.2d at 108–09. Third, we find no merit in Transue's contention that the Union's arguments do not sound in breach of contract. In the initial Complaint, the Union argued that the "grievance procedure remains effective and binding between the parties. Plaintiff further alleges that said grievances are arbitrative under the provisions of the collective bargaining agreement; ... and that the defendant is in violation of the provisions of said article in refusing to proceed to arbitration...." Brief of the Plaintiff at 44 (quoting Complaint). Despite Transue's attempt to characterize the Union's *entire* position in unfair labor practice terms, the Union's argument before this court clearly involves the claim that Transue breached the 1986 Contract.

■ Thus, we conclude that the Union's colorable allegations that Transue's conduct constituted both an unfair labor prac-

tice *and* a breach of contract justified the district court's assumption, under Section 301, of concurrent jurisdiction with the NLRB.[3]

For the foregoing reasons, the judgment of the Honorable David D. Dowd, Jr., United States District Court for the Northern District of Ohio, is AFFIRMED.

---

**3.** As an affirmative defense, Transue raises the claim that Grievances No. 80,000 and No. 90,000 were time barred. First, we reject Transue's affirmative defense on factual grounds. The district court found that Transue initially refused to recognize its grievance and arbitration obligations on December 9, 1986. The union initiated this suit on January 12, 1987, well within the sixth month statutory period. *See* 29 U.S.C. § 160(b); *McCreedy v. Local Union No. 971, UAW,* 809 F.2d 1232, 1237 (6th Cir.1987) ("A union's cause of action to compel arbitration arises when the employer takes an unequivocal position that it will not arbitrate."). Second, we reject Transue's affirmative defense as untimely. Transue first raised this statute of limitations argument in a March 2, 1988 motion to amend the district court's February 22, 1988 judgment. Transue's pleading of this affirma-

tive defense occurred over a year after the Union initiated this suit. On May 12, 1988, the district court rejected Transue's "attempt[ ] to argue a new statute of limitations defense that was not argued earlier" and denied Transue's motion. *International Bhd. of Boilermakers,* No. C87–74A (E.D.Ohio May 12, 1988) (order denying motion to amend judgment). Accordingly, we now hold that Transue failed to raise the statute of limitations defense in a timely manner and the district court's order rejecting that defense must stand. *See Hayden v. Ford Motor Co.,* 497 F.2d 1292, 1295 (6th Cir.1974) ("Whatever the motives behind the ... defendant's pleading strategy, to allow [him] to raise the bar of the statute of limitations after so long a delay ... would make a mockery of the intent and purpose of the statute of limitations.").